Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JEFFREY S. WHITE

| | | |
|---|---|---|
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 09-1550 JSW |
| | ) | |
| TELECONFERENCE SYSTEMS, LLC, *ET* | ) | |
| *AL.*, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Friday |
| | ) | August 6, 2010 |
| _____ | ) | 1:31 p.m. |
| TELECONFERENCE SYSTEMS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 10-01325 JSW |
| | ) | |
| TANDBERG, INC., *ET AL.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

| | |
|---|---|
| **For Teleconference Systems, LLC; Margella Communications, Inc.:** | The Simon Law Firm<br>701 Market Street, Suite 1450<br>St. Louis, MO  63101<br>(314) 241-2929<br>(314) 241-2029 |
| | BY:  **ANTHONY GERARD SIMON**<br>**TIMOTHY EDWARD GROCHOCINSKI** |
| **Reported By:** | **Lydia Zinn, CSR #9223, RPR**<br>**Official Reporter - U.S. District Court** |

1 <u>APPEARANCES (CONT'D)</u>

2 **For Teleconference**          Robert W. Hicks & Associates
  **Systems, LLC:**               14510 Big Basin Way, Suite 151
3                                 Saratoga, CA   95070
                                  (619) 846-4333
4                                 (619) 236-3413 (fax)
                        BY:  **KENNETH ROBERT WRIGHT**
5

6 **For Tandberg, Inc.;**         Weil, Gotshal & Manges LLP
  **Bayer Corporation;**          201 Redwood Shores Parkway
7 **Avago Technologies**          Redwood Shores, California 94065
  **U.S., Inc.; One**             (650) 802-3993
8 **Communications**              (650) 802-3100 (fax)
  **Corporation:**        BY:  **EDWARD ROBERT REINES**
9                              **ANDREW LOUIS PERITO**
                               **SONAL N. MEHTA**
10                             **MATTHEW DOUGLAS POWERS**

11
   **For SAP America:**           Duane Morris LLP
12                                One Market Street
                                  Spear Tower, Suite 2000
13                                San Francisco, CA   94105-1104
                                  (415) 371-2200
14                      BY:  **STEPHEN HOLBROOK SUTRO**

15

16

17

18

19

20

21

22

23

24

25

1          **THE CLERK:**  Calling Case C. 10-1325, *Teleconference*

2  *Systems versus Tandberg*; and Case C. 09-1550, *Cisco Systems,*

3  *Inc., versus Teleconference Systems, et al.*

4          **THE COURT:**  All right.  Please, everybody, would you

5  state your appearances, please?

6          **MR. SIMON:**  Yes, your Honor.  Anthony Simon, on

7  behalf of Teleconference in both cases.

8          **MR. GROCHOCINSKI:**  Tim Grochocinski, on behalf of

9  Teleconference in both cases, your Honor.

10          **MR. WRIGHT:**  Good afternoon, your Honor.

11  Kenneth Wright, for the Teleconference Systems in both cases.

12          **MR. REINES:**  Good afternoon, your Honor.

13  Edward Reines, Sonal Mehta, Andrew Perito, from Weil Gotshal,

14  on behalf of Cisco, and all of the customer defendants, and

15  Tandberg as well.  I can enumerate the customer defendants, if

16  you think it's necessary, except for one.

17          **THE COURT:**  I don't think it's necessary.

18          **MR. SUTRO:**  Steve Sutro, for customer defendant

19  SAP America, in just the Cisco matter; the case -1550.

20          **THE COURT:**  All right.  Very well.  Welcome to all

21  counsel.

22          I called both cases together because, obviously,

23  there are similarities; a lot of overlaps.  And the cases

24  are -- they're officially related, correct, Mr. Reines?

25          **MR. REINES:**  Actually, your Honor, they were deemed

1  not related, but through a fluke of the wheel of judges, you

2  received both.  So --

3          **THE COURT:**  If one were a conspiracy theorist -- I

4  might have some thoughts about that.

5          **MR. REINES:**  I think you're right, but basically the

6  parties have agreed that coördination made sense.  And we can

7  deal with that however the Court --

8          **THE COURT:**  Yes.  All right.  Well, I think that's a

9  good idea.  And so the best way to do this, I think, is -- the

10  parties put together a very good plan in their respective joint

11  case-management conference statements.  So I thought what I

12  would do is -- and I know, obviously, many of the dates

13  coördinate with each other.  So I'll start with Case Number

14  09-1550, *Cisco versus Teleconference, et al*, and set the dates

15  in that case; and then do likewise in the other case.

16          And then, to the extent that anybody else -- anybody

17  has any issues, I'll start with the first case, and then move

18  right along.

19          So, if you will, turn to the schedule that you have

20  in that case.  Starting on page 11, the Court has noted the

21  dates there.  And, with a couple of minor exceptions to

22  accommodate the Court's schedule, I'm going to adopt the

23  schedule that you've proposed.

24          So all of the dates, starting with the first one, the

25  disclosure of asserted claims, et cetera, on September 3rd, and

1  proceeding through the -- on the next page, the filing of reply

2  patent claim-construction brief will be the order of the Court

3  and adopted by the Court, March 4th, 2011; but with respect to

4  the claim-construction hearing, I'm going to change the dates

5  slightly.

6         There is one question I have that -- I just noticed

7  this.  Is there a tutorial built in into this schedule, or am I

8  missing something here?

9         **MR. REINES:**  Your Honor, we didn't include that.  We

10 assumed we could talk about that today.

11        **THE COURT:**  All right.  Well, let me set the dates,

12 then.  So for the claim-construction hearing, it's going to be

13 on March the 22nd at 1:30.  And that's 2011, obviously.

14        And the further case-management conference will be at

15 March 29th, 2011, at 1:00 p.m.  That's subject to change,

16 depending upon when the Court gets around to doing the

17 claim-construction order.

18        I generally like to have a tutorial roughly two weeks

19 before the claim construction; so sometime at the end of

20 February, and preferably on a Wednesday afternoon.  So, Madam

21 Clerk, if we can pick a date late February of 2011 for a

22 tutorial.

23        **THE CLERK:**  Wednesday, February 23rd.

24        **THE COURT:**  All right.  And -- and we'll make that

25 at, let's say, 1:00 o'clock.  And that will give us plenty of

1   time.

2          And the question I have is, just to segue for a

3   moment to case 10-01325, would it be appropriate to have a

4   tutorial -- see, an interesting -- in that case, I'm looking at

5   my notes for that case.  And actually, I had set a tutorial;

6   but is there any benefit to having one tutorial for both cases,

7   or is the technology the same?

8          **MR. REINES:**  The technology's the same, for all

9   practical purposes.  I think it would be unnecessary for the

10  Court to spend its time on two hearings.

11         **THE COURT:**  All right.  Well --

12         **MR. SIMON:**  We agree one tutorial is fine.  There

13  might be some differences in the accused products, but as far

14  as the technology of the patent for purposes of claim

15  construction, it's the same.

16         **THE COURT:**  All right.  Yeah.  It's -- I think I was

17  a little off on my game here when I did this, because I'm now

18  comparing the schedules.  Although I tried to coördinate the

19  two of them, I didn't do a perfect job on that, because I have

20  noted that I set the -- in my notes, when I had my calendar in

21  front of me, in the *Teleconference versus Tandberg* case, I had

22  set the tutorial for March the 22nd, and the claim construction

23  for March the 29th.

24         All right.  Here's what I'm going to do.  I think the

25  way to do this is to have both cases go the same way.  So

1   disregard the further-case-management-conference date that I

2   set in the first case, in the *Cisco* case, as I will set that in

3   my claim-construction order.  And I'm going to set -- so I'm

4   going to set the tutorial in the *Cisco* case March 22nd, 2011,

5   at 1:30; and the claim construction on March 29th, 2011, at

6   1:00 p.m.  And that gets -- that will give everything put

7   everything into a parallel mode for the two cases.

8              So I'm also going to -- although I have frequently --

9   most of the time I handle my own discovery dispute resolution.

10  I have found, reluctantly, that in patent cases, that's

11  absolutely impossible, not because people are more contentious,

12  although they are; it's just that there are -- many more

13  discovery disputes seem to arise.

14             So I'm going to send both cases out to a randomly

15  selected magistrate judge for discovery dispute resolution --

16  both cases to the same magistrate judge, which I think makes

17  sense, in light of the overlap of the patents involved.

18             **MR. REINES:**  Your Honor, on that issue, I don't know

19  if your practice is.  If the parties had a suggestion of a

20  particular magistrate judge, is that the kind of thing that

21  you're open to, or do you prefer to do it randomly?

22             **THE COURT:**  You know, I rarely get agreement, but if

23  there's an agreement, I think that any magistrate -- most of

24  the magistrate judges enjoy doing this work in the patent area.

25  So if you all can agree, I would be willing to sign an order,

1    subject to the approval of the designee, of course.

2            **MR. REINES:**  Of course.  Thank you.

3            **THE COURT:**  I have to face my colleagues

4    occasionally, so I want to make sure it's okay with them.

5    Usually they're pretty okay with it.  So if you can, do that.

6            I will give you -- how about two weeks from today?

7    So I'll stay referring the discovery to a magistrate judge

8    until two weeks from today, which would be August the 20th.

9            And parties should notify me either way by the close

10   of business that day; whether they've agreed or not.  If you

11   haven't agreed, then it will be self-executing, and the minutes

12   will reflect that the Court will refer the matter out to a

13   randomly selected magistrate judge.

14           The other thing you could do is you could -- I give

15   parties this option when there's general consent, which I'm not

16   necessarily suggesting in these cases.  You can agree to a

17   small group of magistrate judges that you all can agree on.

18   Maybe you don't agree on $X$, but you can agree on $X$, $Y$, and $Z$,

19   but not the rest of the alphabet.  And we'll randomly assign it

20   to one of those three folks that you have so designated.

21           So I don't know, in the *Cisco versus Teleconference*,

22   if there are any other issues to be discussed at this time.

23           I assume that the parties have discussed ADR in that

24   case.  What's the status of any ADR movement?

25           **MR. REINES:**  We're in front of Judge Spero, who's

1  obviously very good at these things.  And we've had preliminary

2  discussions.  We have a call with him August 11th to set up the

3  next discussions we're going to have.  It's moving apace, and

4  the parties are working very coöperatively.

5          **THE COURT:**  On both cases?

6          **MR. REINES:**  On both cases.

7          **THE COURT:**  Is there anything else in the *Cisco* case?

8          **MR. REINES:**  Yes, your Honor.  I think there's -- I

9  think there's at least two issues that we would like to

10  discuss.  One is a little bit of a chunky procedural issue,

11  which is bifurcation of damages -- liability and damages.  It's

12  commonly done.  It's certainly not always done.  It's case

13  specific.  We think this is a poster child for bifurcation.

14  And let me explain why; what's unique about this that makes

15  that fit so nicely.

16          In this case, as you could tell, there's a lot of

17  customers, which is not typical.

18          **THE COURT:**  Right.

19          **MR. REINES:**  And our concern is that the theory of

20  damages recovery that's been articulated at this point -- it's

21  been a big focus in settlement in our discussions -- is

22  recovery for cost savings due to having a high-end

23  video-conferencing system.  And the theory is that it's -- that

24  the royalty wouldn't be on the cost that Cisco charges its

25  customers to buy its video-conferencing system, but that the --

1    that Teleconference Systems would share in the savings.

2             So, for example, if you have a teleconference between

3    New York and San Francisco, the cost savings is:  Two people

4    don't have to fly from San Francisco to New York, and stay in

5    hotel, and stay in an airplane, and the cost of time lost to

6    travel.

7             Obviously, if you're going -- every video-conference

8    system at major companies, such as Procter & Gamble, and banks,

9    and Wells Fargo, and whatever it is -- that kind of calculation

10   is a nightmare.  I mean, just every time a video-conference

11   system is used, determining savings.  And even trying to do it

12   at a generalized level of:  What are your general travel

13   budgets for all of your different personnel, and how have those

14   been reduced?  Or however you try to do it, it's extremely

15   complicated.  This isn't your garden-variety,

16   5-percent-of-revenue case.

17            And so, instead of having 11 different parties or 12

18   parties or 13 different parties exposing themselves and their

19   management to that kind of invasive discovery, we propose in

20   this case that what makes sense is to have a liability phase,

21   and determine whether or not there is actual liability.

22            And then, if there is liability, if they want to

23   attempt to count up frequent-flier miles in their value and

24   everything else, at that point in time, we could take that

25   major undertaking.

1          Of course, we have arguments that that's not an

2    appropriate way to do the calculation anyway; but they're going

3    to seek discovery on it.

4          So you have 12 different parties that would be

5    exposed to such discovery, when normally the manufacturer -- if

6    it was just us and them, to be honest with you, I would -- if

7    it was a typical case, Teleconference Systems against Cisco,

8    and they just want 2 percent per system, I wouldn't be here

9    proposing a bifurcation of liability damages; but it's these

10   sort of innocent third parties who just bought a

11   video-conference system, and the invasiveness and burden on

12   them, that raises this.

13          **THE COURT:**  How would bifurcation, before I hear from

14   defendants, impact settlement discussions?  Because, to the

15   extent that the plaintiffs don't have an opportunity to

16   discovery on damages, you can discuss liability only so long in

17   settlement discussions; but what would be the basis for there

18   being bargaining or negotiation with respect to damages?

19          **MR. REINES:**  I anticipated you'd ask that good

20   question.  And the answer to that is that we've been in

21   discussions in front of Judge Spero.

22          And the primary interaction -- I don't want to get

23   into the specifics, and I'm sure this doesn't -- is that

24   Teleconference Systems has sought this precise information,

25   because they really want to get the cost savings as their

1  royalty base.

2          We've agreed, for purposes of the settlement

3  discussions, to provide the high-level numbers.  So, in other

4  words, if there was a marketing presentation that Cisco is

5  selling its teleconferencing system that says, "If you buy our

6  teleconferencing system for" -- I don't know.  50,000, or

7  $100,000, or whatever it is -- "you will save a million

8  dollars."  We're agreeing to give them those -- like, that

9  marketing-style information, because that -- because then we

10 think we can get a settlement discussion going.

11         Those numbers are not -- are going to be pie in the

12 sky, as far as we're concerned, from a settlement perspective;

13 but that's neither here nor there, for present purposes.  So

14 we're not refusing outright to give them information at the

15 high level; the marketing deal/transaction/purchase information

16 that you might have.

17         What we are objecting to and wouldn't do in a

18 settlement context, and probably wouldn't do voluntarily, even

19 in the court -- in the court context, without a fight, to be

20 honest, is the counting of the beans; is the counting of:  What

21 was the real savings that was accomplished?  Because it's just

22 a -- it's just a nightmare, from a discovery perspective.

23         **THE COURT:**  So under your proposal, then, other than

24 with respect to settlement discussions, damages would be placed

25 on hold for purposes of, for the moment, discovery.

1        We go through and construe the appropriate terms.

2   Summary judgment would ensue.  And then, if the case still

3   survived, then we would open up discovery with respect to

4   damages?

5        **MR. REINES:**  We're pragmatic.  So if at any point in

6   time it became obvious that, for some reason, damages needed to

7   open up -- as you say, summary judgment -- we'd be open to

8   that.

9        I don't think it should be something chiseled in

10  stone; but at this stage in the case, it just seems that what

11  we're going to get is a wave of invasive discovery on all these

12  different parties that's extremely expensive, and might be a

13  basis for settlement, itself, on the burden side.

14       And so -- but you describe, I think, properly, how

15  we're looking at how this should be handled.

16       In the settlement process we've been -- the Judge has

17  ordered us -- Spero -- to provide materials necessary for

18  settlement.  So he's going to be administering what we need to

19  give them that he thinks is necessary, from a settlement

20  perspective.  So he retains that power to do that.

21       **THE COURT:**  All right.  Let me hear from the

22  defendants.

23       **MR. SIMON:**  Your Honor, Tony Simon, on behalf of the

24  defendants.

25       I think the biggest consideration we have is exactly

1   the one your Honor pointed out.  And that's one of the disputes

2   we have that we're going to discuss with Judge Spero next week.

3   The problem is the marketing information that they want to give

4   us.  They can agree it's pie in the sky, and not relevant to

5   settlement.

6           Contrary to the representations made about this

7   theory, you know, the Section 284 of the patent statute says

8   we're entitled to a reasonable royalty based on the defendants'

9   use of the system.

10          We didn't sue Cisco initially.  We didn't sue their

11  customers.  Cisco doesn't sell the whole system.

12          We sued defendants who had our system -- our

13  client -- you know, covered by our client's patent -- for using

14  the system.  And their use generates cost savings.

15          It's a matter of:  What was your budget for travel

16  expenses -- the actual expenses before you had the system for

17  three years?  And what were your travel expenses after you

18  acquired the system?  That's what the discovery consists of.

19  It's not burdensome.  It's not novel.

20          **THE COURT:**  Why does it have to happen now?  If I

21  were -- for example, if I were to go even slightly further --

22  maybe it's not even further than what Mr. Reines just

23  proposed -- and delegated to the magistrate judge doing the

24  settlement the authority -- we're appropriating a native

25  settlement to order appropriate discovery -- how are you

1  harmed, at this point?

2          MR. SIMON:  Well, there are actually three other

3  reasons.  The most important one was settlement.  Obviously,

4  that would be taken care of there; but the second reason,

5  Judge, is --

6          THE COURT:  Please don't call me "Judge."  I don't

7  like it.

8          MR. SIMON:  I'm sorry, your Honor.

9          THE COURT:  Thank you.

10          MR. SIMON:  Your Honor, the second reason would be

11  with respect to duplication of travel.  We are going to each

12  defendant and take a deposition for liability purposes.  We

13  think it's most efficient, since these defendants are spread

14  across the country, to take the second day and get the

15  information with respect to the damages.

16          The other reason is it's an overlapping relevance.

17  And I fear that it's going to spur additional discovery

18  disputes.  The commercial success is relevant to the invalidity

19  issue, so it goes to the liability stage.

20          They're going to argue that the patented invention is

21  obviousness.  Some of our rebuttal for that liability issue

22  goes to the commercial success.  And the commercial success

23  goes directly to the use made by the defendants of the

24  invention; the acceptance in the industry; those kinds of

25  things.

```
 1          And then the last one, your Honor, is with respect
 2   to -- with respect to the settlement issue.  And this is a
 3   little bit tricky, because we have not been able to determine
 4   this, but it's one of the reasons it's not a typical customer
 5   suit, is that we are trying to negotiate settlements with each
 6   defendant.  We -- it's not clear to us whether or not Cisco is
 7   stepping in and agreeing to indemnify fully the amount of any
 8   judgment.  So a particular defendant, unless we get that
 9   particularized discovery, won't even know the extent of our
10   liability to consider settlement if we're not able to get that
11   information.
12          THE COURT:  All right.  Mr. Reines, how do you
13   respond to each of those points?
14          MR. REINES:  Thank you, your Honor.
15          On the first issue, which is the second day of
16   deposition, common sense tells us the party -- the person
17   that's going to know about the specifics of the technology, of
18   how it's configured in terms of the boxes they have for video
19   teleconferences, is a different person than the person that's
20   maintaining the travel budget or the person that's booking
21   meetings or whatever else.
22          THE COURT:  But what if it wasn't?  You say that, but
23   let's say they depose -- they notice the deposition of -- let's
24   just pick a 30(b)(6) deposition on person most knowledgeable on
25   XYZ.  And that happens to include -- and this is also a
```

1   marketing person.  So it -- I mean, you say that, but if you

2   can't -- you know, they have a right to do anything appropriate

3   discovery, unless I order bifurcation.

4            **MR. REINES:**  Yeah.  I think that argument would apply

5   every time that, you know, there's bifurcation.  Obviously, a

6   lot of courts use that tool.  And it's recommend in all of the

7   classic management guides.

8            I think the extent of overlap is very small, for the

9   reasons I just described.  If there was some unique situation,

10  we've worked very coöperatively throughout the last year and a

11  half in this case, and I think we could do that.  We're not

12  going to be headstrong about that issue, but I just don't think

13  the extent of that is substantial.

14           And to the extent it's a second day for every

15  witness, yes, we're saying a second day for every one of the

16  customers' witnesses should happen until liability is

17  established, because of the unusual extent of the burden here

18  of the damages discovery.  And -- and Teleconference Systems

19  doesn't deny what kind of discovery they're going to be seeking

20  on the travel budgets and everything else.

21           The second argument that was made is commercial

22  success.  And again, if the presence of commercial success in

23  the patent case was a poison pill for bifurcation, then there

24  would never be bifurcation.

25           Here, it is -- again, we're willing to give some

1    generalized information in the marketing-level information, but

2    the idea that they're going to prove that their patent's valid

3    because, many years after it issued, some people saved more or

4    less money on first-class or business-class tickets is so

5    indirect, I'm sure that we'll be able to satisfy their desire

6    for information regarding commercial success that's sufficient,

7    that doesn't require plunging into each of 12 or 13 companies

8    and their entire travel guidance surrounding their

9    teleconference systems.

10            The third issue I didn't really get.  Cisco is

11   obviously stepping to the plate in this case.  As -- by the

12   fact that we're the attorneys here for these defendants.

13            I don't know what they need.  We're the one going to

14   the settlement conference.  I don't know what information they

15   need that -- I don't know how discovery that's invasive of them

16   would inform them as to what -- how the case is to be resolved.

17   And I'm concerned that a lot of invasive discovery of them

18   would create a lot of problems in a customer base that would

19   create the wrong kind of settlement dynamic.

20            **THE COURT:**  All right.  I'll give you the last word,

21   if you wish, but not to repeat any of the arguments.

22            **MR. SIMON:**  Your Honor, I really don't have anything

23   to add.

24            **THE COURT:**  All right.  What I'm going do at this

25   point is the following.  And I think it takes into account the

1   arguments on both sides, but also achieves judicial economy.

2           I'm going to order bifurcation of liability and

3   damages.  And I'm going to call it "presumptive bifurcation."

4   And what I mean by that is what has already been articulated by

5   both sides.  In the settlement context, Magistrate Judge Spero

6   already has exerted his appropriate authority in aid of

7   settlement to order production of relevant documents.  And the

8   parties seem to have been coöperative.

9           If there is a -- if there's resistance to that, at

10  that point, then we go to the second piece of this, which is --

11  I think it would be a bit awkward to have Judge Spero be the

12  settlement judge and also to litigate discovery disputes,

13  because he might have to get his hands into, you know, the

14  substance of the controversy; but to extent that there is

15  resistance to any order or, if you will, exhortation by

16  Judge Spero to produce damage-related documents for the purpose

17  of settlement, then that could be litigated before the

18  discovery magistrate judge.

19          And the second reason I'm calling this "presumptive,"

20  or, putting it a different way, the exception to the

21  bifurcation, would be the situation posited -- not necessarily

22  specifically mentioned by the plaintiffs, but referred to by

23  defense -- which is:  If there is a unique situation, such that

24  a witness is going to be -- who is the best person to be

25  testifying about a damage issue, and he or she is going to be

1  leaving the country, leaving the jurisdiction, leaving the

2  company, and not available for deposition, or is ill, or they

3  live in a foreign country, such that it would be extremely

4  wasteful of resources to not have them also available for a

5  damage piece, without it consuming the rule, which is there's

6  going to be bifurcation in this case.

7          And I'm expecting, you know, the excellent counsel

8  that's before the Court to work together, understanding what

9  the Court's mindset is on this, to make it work.  And if not,

10  both the magistrate judge, Judge Spero, doing the settlement,

11  or the soon-to-be-named magistrate judge for discovery could

12  deal with it.

13          So it frequently happens, because I keep in very

14  close contact with magistrate judges where my cases are

15  referred out for discovery, almost when anything occurs in the

16  case, we talk to each other.  And if a Magistrate Judge comes

17  to me and says, "You know, your order's being misused," or

18  "It's really causing a huge burden," you know, I bring you all

19  back, and we'd have a hearing on it, and we could discuss what

20  needs to be done.

21          And I guess what I'm saying, largely to the

22  plaintiffs, is:  If you -- if you have a record -- and I expect

23  you're going to do this in good faith -- that you're really

24  being aggrieved by this prejudiced by my order down the road in

25  terms of real -- you know, what actually goes on on the ground,

1   then bring it up before the magistrate judge.  And if you can't

2   get a resolution, come to this Court, and I could easily change

3   my ruling, because things change in a litigation.  And if it

4   looks pretty clear that the case is going to be, you know,

5   unduly, you know, lengthened because of the bifurcation, I

6   generally don't do it, because I think it aids settlement, but

7   I think in unique circumstances of this case, procedurally as

8   well as substantively, at least from what I know at this point,

9   I think it makes sense, because if I did the opposite, and I

10  said, "No bifurcation," it's pretty hard to put that

11  Humpty Dumpty back together again.  It's easier to open it up

12  and say, "Okay.  You know, we've gone down the road this far.

13  It hasn't worked.  It's been abused," or whatever.  And to do

14  it the other way, that's what I'm going to do.  That will be

15  the order of the Court.  The minutes will so reflect.

16          Did you want to say something, Counsel?

17          **MR. SIMON:**  I had one clarification.  We do have a

18  conference call with Magistrate Judge Spero next week to talk

19  about this very issue.  We've asked for some of the

20  information.  They want to give us marketing material.  Is it

21  your order that if there's a dispute about that; that it would

22  be Magistrate Judge Spero that decides that, for purposes of

23  settlement or the discovery?

24          **THE COURT:**  What I'm saying is -- it's a little bit

25  of an odd situation, because obviously, if the defendants

1 agree, then it's not an issue.  If they don't agree, I can't

2 order a pig in a poke, as it were.  I can't say, "Well, you

3 know, they have to produce whomever Judge Spero indicates."

4          Now, I don't want to order -- I don't want to put

5 Judge Spero in a situation where he's, in effect, a settlement

6 judge and a discovery judge.  That's very awkward.

7          So my suggestion would be that if there is that kind

8 of dispute, you put it on the shelf and get the discovery

9 magistrate to deal with it, with the notion of what I've said

10 and what Judge Spero's said, which is:  To the extent that this

11 truly relates in aid of settlement, and not discovery in the

12 classic sense to prepare for trial or summary judgment or

13 whatever or claim construction, then that -- I would delegate

14 to the discovery magistrate judge the authority to order the

15 production of limited discovery on damages in aid of

16 settlement.

17          Does that answer your question?

18          **MR. SIMON:**  Yes, your Honor.

19          **THE COURT:**  And it's going to require a coöperative

20 relationship, but I don't -- unless the parties were to agree

21 that Judge Spero would be the discovery judge as well, which

22 you could do, and he agrees to that, then he'd be wearing all

23 of the hats.

24          In other words, I'm not prohibiting that, but it's a

25 right that the parties have to preclude a settlement judge from

1  getting into the substance, which he or she would have to do if

2  they were getting into the discovery.  All right?

3         Mr. Reines, do you have anything you want to say?

4         **MR. REINES:**  Not on that topic.

5         **THE COURT:**  Did you want to quit while you were

6  ahead?

7         **MR. REINES:**  Quit while I was ahead on that topic.

8  Thank you, your Honor.

9         The second issue that we had with regards to

10  discovery limits -- and this is on pages 9 and 10 of the

11  case-management conference statement jointly submitted in the

12  1550 matter.  And this was just to put some bounds, again,

13  on -- I think your Honor wisely stated as a presumptive

14  basis -- some presumptive bounds on discovery.  We've worked

15  together coöperatively, as I've said; but I think it's harmless

16  to put these in place; and, in fact, helpful.

17         So we would ask for a request for a production of

18  documents of 50.  Request for admissions of 30.

19  Interrogatories of 25.  And then the depositions that we asked

20  for, which is really 10.  It's pretty close to default, but as

21  the Court knows, I'm requesting production.  There's normally

22  no limit, and that sometimes can lead to excesses that should

23  be discouraged.

24         **THE COURT:**  What I'm going to do on that is delegate

25  that to the discovery magistrate judge, because for me, it

```
 1   would be really shooting in the dark.  You're going to be able

 2   to educate that magistrate judge.  I'm going to be educated

 3   sort of secondarily as the case goes forward.  And that

 4   magistrate judge will determine.

 5          Because to say, you know -- I mean, most of the -- of

 6   the patent cases that -- of which I've presided or I've heard

 7   about usually require more than the federal rule limits, just

 8   because they're so complicated; but this is essentially a

 9   one-patent case.  So I can imagine a circumstance -- and I

10   think it might -- and I would exhort the discovery magistrate

11   judge to put in limits.  Maybe it's, you know, numbers of hours

12   of depositions.  I've done that.  Maybe it's a total number of

13   document requests; but I think that magistrate judge would want

14   to see a discovery plan, so they could -- you know, where the

15   party wanting more than whatever the other party wants can say,

16   "Wait a minute.  If we did 50, we would be cutting out this

17   whole other area."

18          So for me to do that -- I'm very strongly in favor --

19   I think any good lawyer can make their case and try their case

20   with the limits imposed by the rules.  And I generally like to

21   stick with those, but if I'm going to be delegating the

22   discovery out to a magistrate judge, which I do reluctantly,

23   I'd rather have that judge make that decision.  So I'm not

24   going to make that decision.  All right?

25          MR. REINES:  Thank you, your Honor.
```

1          THE COURT:   All right.   So that will be -- that's all

2     I have on that particular case; but go on, sir.   Yes.

3          MR. SIMON:   I'm sorry.   We did have one question,

4     your Honor.

5          Realignment of the parties.   The schedule we've set

6     up here really puts us, as the plaintiffs, in a normal

7     patent-infringement case, we're the patent owner.   And we

8     contemplate an amendment of the pleadings.   And I was just

9     going to request if we could, at that point, we could file a

10    complaint.   Right now we're the defendant, and then we have a

11    counterclaim, and then a third-party complaint.

12          THE COURT:   That's because there were dec.-relief

13    actions filed?

14          MR. SIMON:   Yes, yes, yes.

15          THE COURT:   What's your response to that, Mr. Reines?

16    The Court obviously has authority to do that.

17          MR. REINES:   Yeah.   Thank you, your Honor.

18          The way we got to where we got was:   The original

19    complaint in this case that set off these three litigations

20    now, was a complaint only against Cisco's customers.   And Cisco

21    stepped up the plate and filed a declaratory-judgment action in

22    this Court, which is the first filed action in this court.   And

23    it was deemed that that was the primary action; and the other

24    action was transferred there.

25          That background is important, because I think there

1    is significance to the fact that Cisco filed this case.

2         Now, I'm not asking right now -- and I don't think it

3    would be appropriate right now -- for the Court to put -- set

4    in stone what the trial's going to look like in this matter.

5         I mean, we have two cases going this way and that

6    way; two very different sets of products, or at least pretty

7    different sets of products, in the abstract.  And so I think

8    it's very premature, if we can't set discovery limits now and

9    we can't do some of these other things, to decide a structure

10   at trial, which is really the only consequence of the

11   realignment, I think.

12        **THE COURT:**  Let me interrupt and say my typical

13   practice in this situation -- because I have this come up all

14   of the time.  I had one.  I have one before me that was so

15   contentious -- the parties couldn't agree, even as we were

16   getting more to the end of the case -- that I had to bring in a

17   Special Master to help the parties to mediate the issue of who

18   would be the plaintiff.  Can you imagine that?  But they were

19   all willing to pay for it.

20        So I would -- we may get to this point even earlier

21   than pretrial, but what I typically do -- what I typically see

22   in the pretrial filings is briefing on the Court's exercise of

23   its discretion with respect to realignment of the parties.

24        And typically it becomes an easier question, then,

25   because we see how the discovery is drawn; how the claim

1    construction is going.  And it becomes pretty manifest.

2           I have not had many problems.  One case was an

3    exception, but because there were many, many, many patents.

4    And there was a real fight, a legitimate fight on who really

5    was the plaintiff, and one lawyer said she had a constitutional

6    right to be the plaintiff.  I'm still looking for the amendment

7    that contained -- maybe there's a patent constitution out

8    there.  Maybe.

9           To the extent you're requesting it now, I'm just

10   going to deny it without prejudice.  And you know, the minutes

11   will reflect that the Court will deal with that issue at no

12   later than the pretrial process.  And if the parties believe

13   that the processing of the case or the litigation of the case

14   has seen an impasse because there's a dispute about who ought

15   to be the plaintiff -- I can't imagine that happening -- then I

16   will -- you can file an administrative motion or a notice

17   motion, and I'll make the decision.

18           All right.  Does that answer your question?

19           **MR. SIMON:**  Thank you, your Honor.

20           **MR. REINES:**  Thank you, your Honor.

21           **THE COURT:**  All right.  Very well.  So now let's go

22   to the next case.  This should be easier.

23           So the schedule in that case is substantially similar

24   to the schedule in the first case, if not identical.  Am I

25   correct in that?

1          MR. SIMON:   Identical.

2          THE COURT:   I'm going to adopt that as well, if it

3    makes it easier.  And the rulings I made in the first case will

4    be the rulings in the second case.

5          And if there comes a time when the parties believe

6    that something more formal, like consolidation or some other

7    coördination -- more than coördination, but some further

8    alignment of the cases, let the Court know, because I imagine

9    the parties anticipate that the claim -- the same terms would

10   be -- would be construed the same presumptive; at least

11   initially.  Ten terms in both cases.  Is that correct,

12   Mr. Reines?

13         MR. REINES:   Your Honor, there may be one or two

14   terms.  We're not there yet; but one or two terms only relevant

15   in one case versus the other; but I think that the presumptive

16   limit of ten should apply to both cases collectively.  So in

17   other words, I think one claim-construction process, treated as

18   though it's one case in terms of the numerical limits; but the

19   only caveat that I'm making is it is conceivable that a

20   construction of one term or another term might be applicable

21   only to one case.

22         THE COURT:   All right.  Do you agree with that?

23         MR. SIMON:   We agree, your Honor.

24         THE COURT:   All right.  And the good news is I think

25   by the time we get around to claim construction -- to the

1    claim-construction process, we'll actually have technology in

2    this court, which may or may not be infringing.  Maybe we can

3    have teleconferences as well, but I guess we have to do a

4    certificate to make sure that we're not infringing on anybody's

5    patent; but that will work out well.  We'll do the claim

6    construction, and we'll do the tutorial.  And you all can

7    coördinate.

8            And the way -- just so -- since I have you here now,

9    I will tell you that the way I typically do the tutorials --

10   have the experts do it; make the presentation to the Court.

11   And have video equipment to capture the tutorial, but it's not

12   otherwise on the record.  It's just so that the Court can

13   review it at different stages of the case.

14           The presentations -- and to try to make them -- it's

15   hard to say this in patent cases -- as informative as possible,

16   and less, shall we say, "advocative."  I'm not saying

17   "persuasive"; but not advocative, because then it just gets

18   into a fight.  It's just like having a mini claim construction.

19           And I also don't mind in the claim-construction

20   process having a contextual discussion about the allegedly

21   infringing product, because the Federal Circuit has now finally

22   told us, if not formally, informally, that we can find out

23   about context, because I always ask the question, "Why do I

24   care about this?"  Why do I care if "as" means "and," or

25   whatever construct's coming down the pike?

```
 1           And I think I'm entitled to ask that, if I feel I
 2  need to construe additional terms on my own decision, which I
 3  have done.  I will do it.
 4           So is there anything else to cover in these two
 5  cases?
 6           MR. SIMON:  No, your Honor.
 7           I would like to point out there's one of our orders
 8  which wouldn't be applicable to the second case.  Because we
 9  are the plaintiff already in that case, there would be no need
10  for realignment in that.
11           THE COURT:  We're not there yet.
12           MR. SIMON:  Right.
13           THE COURT:  We'll have to figure out -- for example,
14  one possibility is -- I don't even know if this is -- counsel
15  know this better than the Court would know it; as to how we try
16  this case if we do get -- how do we do summary judgment when
17  there's presumptively one summary judgment per side; but there
18  are two cases here?
19           How realistically -- that should be a license to
20  argue the same issues, because there are two different cases.
21           If we get to trial, how do we try the case?
22           We'll deal with all of that during the -- during the
23  pretrial process, which is quite substantial.
24           So that's all really I think we can deal with at this
25  time.  Is there anything further?
```

1          **MR. REINES:**  No, your Honor.

2          **MR. SIMON:**  Nothing from our side, your Honor.

3          **THE COURT:**  I will expect to get you your stipulation

4  or not or lack of stipulation or not stipulation, and we'll get

5  a rolling meeting with a coördinating magistrate judge, so we

6  can move this case along; but I really do appreciate counsel

7  working together.

8          And I want to say one other thing, which is already

9  implicit.  The Court values having associates work on these

10 cases.  I don't mean working in the back and -- like a

11 proverbial mushroom.

12         I'm talking about getting a chance to argue and, you

13 know, do stuff:  Depositions, and argument in court, and even

14 having recent associates presenting on particular terms in a

15 patent in the construction process.  So I can't order it, but I

16 can exhort you.  Otherwise, there will be no next generation of

17 associates.  So, to the extent you can do that, more power to

18 you.

19         All right?  Thank you very much, counsel.

20         **MR. MEHTA:**  Thank you, your Honor.

21         (At 2:11 p.m. the proceedings were adjourned)

22

23

24

25

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing proceedings in C. 10-1325 JSW and C. 09-1550 JSW,
*Teleconference Systems LLC v. Tandberg, Inc.*; and *Cisco
Systems, Inc. v. Teleconference Systems, LLC, et al.*, were
reported by me, a certified shorthand reporter, and were
thereafter transcribed under my direction into typewriting;
that the foregoing is a full, complete and true record of said
proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said
transcript may be void upon disassembly and/or removal
from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Monday, October 4, 2010

Lydia Zinn, CSR,  RPR
Official Reporter -  U.S. District Court
(415)  531-6587