PARTIES LISTED ON SIGNATURE PAGE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CISCO SYSTEMS, INC., | |
|        Plaintiff, | |
|     v. | |
| TELECONFERENCE SYSTEMS, LLC and MARGALLA COMMUNICATIONS, INC., | Case No. C 09-01550 JSW |
|        Defendants, | |
| AND RELATED THIRD-PARTY PROCEEDING. | |
| TELECONFERENCE SYSTEMS, LLC, | |
|        Plaintiff, | |
|     v. | Case No. c 10-1325 JSW |
| TANDBERG, INC., et al, | |
|        Defendants. | |
| TELECONFERENCE SYSTEMS, LLC, | |
|        Plaintiff, | |
|     v. | Case No. c 10-5740 JSW |
| AT&T CORP., et al, | |
|        Defendants. | |

**TELECONFERENCE SYSTEMS, LLC AND MARGALLA COMMUNICATIONS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

# I.   **INTRODUCTION**

U.S. Patent No. 6,980,526 ("the '526 patent") was filed on March 26, 2001 and issued on December 27, 2005.  The '526 patent is the only patent in suit.  The '526 patent is titled "Multiple Subscriber Videoconferencing System."  Exhibit 1, '526 patent.  The Abstract of the '526 patent states:

> A system, method, and device for use in videoconferencing.  The method typically includes installing a videoconferencing services switch at an access point to an IP network, and registering a plurality of subscribers for videoconferencing services.  Each subscriber typically has a plurality of endpoints.  The method further includes receiving subscriber specific settings to be applied to multiple videoconferencing calls from the plurality of endpoints associated with each subscriber.  The method further includes storing the subscriber-specific settings at a location accessible to the switch, and configuring the switch to connect calls from the plurality of endpoints at each subscriber based on the corresponding subscriber-specific settings.

Exhibit 1, Abstract.

On April 1, 2011, pursuant to Patent L.R. 4-3 and in accordance with the Court's March 18, 2011 Orders,  the parties submitted a Joint Claim Construction and Prehearing Statement (Doc. 242-1).  The parties have identified ten terms on which the parties have been unable to reach agreement as to their proposed construction.  These terms, and the claims in which they appear, are set forth in the below table.

|   | **Claim Term** | **Claims** |
|---|---|---|
| 1 | "videoconferencing services switch" | 1, 5-8, 18, 22, 24, 26 |
| 2 | "enterprise gateway" and "enterprise video gateway" | 6, 9, 18, 19, 26 |
| 3 | "access point" | 1, 5, 18, 23, 26 |
| 4 | "service provider IP network" and "service provider network" | 1, 5, 18, 23-26 |
| 5 | "subscriber" and "enterprise subscriber" | 1, 5 |
| 6 | "configuring the switch to connect calls" and "being configured to process videoconferencing [calls / data]" | 1, 5, 18, 26 |

| 7 | "a core router configured to route videoconferencing traffic across a computer network backbone to a destination terminal in a remote zone" | 25 |
| 8 | "subscriber-specific settings" and "subscriber-specific security settings" | 1-5, 17, 18, 26 |
| 9 | "a firewall exists between the enterprise gateway and the video conferencing data is passed the firewall unexamined" | 9 |
| 10 | "virtual router" | 26 |

## II.   LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Claim terms are given their ordinary meaning to one of ordinary skill in the art, that is, someone who is "aware of all the pertinent prior art," yet "thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985). Further, claim terms are interpreted from the point of view of a person of ordinary skill in the art who "is deemed to read the claim terms not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). To consider what this person of ordinary skill would understand, the Court must consider "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of the technical terms, and the state of the art." *Id.* at 1314 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

Claim construction naturally begins with and focuses on the claims themselves. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1334 (Fed. Cir. 2001). "It is

well settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms take on their ordinary and accustomed meaning unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324(Fed. Cir. 2002).

While the Federal Circuit has held that extrinsic evidence in the form of dictionaries and treatises may be useful in assisting in understanding the commonly understood meaning of terms, the Court has cautioned against "heavy reliance" on dictionary definitions. *Phillips*, 415 F.3d at 1312-17. In *Phillips*, the Court stated "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of a claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id*. at 1321. In support of this view the Court noted:

> By design, general dictionaries collect the definitions of a term as used not only in a particular field, but in many different settings. In such circumstances, it is inevitable that multiple dictionary definitions for a term will extend beyond the 'construction of the patent [that] is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending.' Thus, the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent.

*Id*. at 1321-22.

III.    CLAIM TERMS AT ISSUE

1.    "videoconferencing services switch"

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| a videoconferencing device that is configured to receive control data such as call set-up information, receive and manage transfer of real-time audio and video data streams, provide quality of service capabilities, provide security capabilities, and enforce policies based on subscriber specific settings. | videoconferencing device that processes videoconferencing call requests and establishes connections between subscribers' terminals for those calls |

TS's proposed construction is taken directly from the intrinsic evidence.  The parties do not dispute that the videoconferencing services switch is a videoconferencing device.  As shown below, the specification states that the videoconferencing services switch is a videoconferencing device that is configured to: (a) receive control data such as call set up information; (b) receive and manage transfer of real-time audio and video data streams; (c) provide quality of service capabilities; (d) provide security capabilities; and (e) enforce policies based on subscriber specific settings.

| | Proposed Construction | Intrinsic Evidence |
|---|---|---|
| (a) | receive control data such as call set up information | **Switch 12 typically includes a control plane module** 302 and a data plane module 304. … **Control plane module 302 is <u>configured to receive control data such as call set-up information</u>** through network interface 308, data plane ingress port 318, or data plane egress port 320.<br><br>Exhibit 1, '526 patent, c. 6, ll. 46–56 (emphasis added).[1] *See also* c. 3, ll. 20–44, c. 4, ll. 23–32, c. 8. ll. 46–48. |

---

[1] All emphasis herein is added unless otherwise noted.

| (b) | receive and manage transfer of real-time audio and video data streams | **Switch 12 typically includes** a control plane module 302 and **a data plane module** 304. … **Data plane module 304 includes a network processor 314 and memory configured to receive and manage transfer of real-time audio and video data streams** from ingress ports 318 to egress ports 320.<br><br>Exhibit 1, '526 patent, c. 6, ll. 46-47, c. 6, l. 65-c.7, l. 1. *See also* c. 3, ll. 36-44, c. 7, ll. 1–23, c. 11, ll. 4–8. |
| (c) | provide quality of service capabilities | **Switch 12 also includes a quality of service module** 420 having a Multi Protocol Label Switching (MPLS) traffic engineering module 422 configured to create a network path engineered according to the MPLS standard.<br><br>Exhibit 1, '526 patent, c. 8, l. 66–c. 9, l. 11. *See also* c. 6, ll. 46–63. |
| (d) | provide security capabilities | **Videoconferencing services switch 12 also typically includes a security module 431.** Security module 431 typically includes a SIP/H.323 firewall 432, SIP/H.323 NAT module 434, encryption module 436, and Virtual Private Network (VPN) module 438. SIP/H.323 firewall 432 is configured to prevent unauthorized access to video services switch 402, and through it to subscriber networks.<br><br>Exhibit 1, '526 patent, c. 9, ll. 42–57. *See also* c. 11, ll. 41–67–c.12, ll. 1–25. |
| (e) | enforce policies based on subscriber specific settings | **Switch 12 also includes a policy engine 418 configured to enforce policies based on subscriber-specific settings on the videoconferencing calls**. The policies may be based on subscriber-wide settings 408f that apply to all calls from a given subscriber, and user-specific settings that apply to only a single user or terminal of a given subscriber.<br><br>Exhibit 1, '526 patent, c. 8, ll. 49–65. *See also* c. 3, ll. 6–54, c. 11, ll. 52–55, c. 12, ll. 58–67–c. 13, ll. 1–22. |

As shown below, Figures 3 and 4B of the '526 patent also make it clear that the term

videoconferencing services switch, as used in the '526 patent, means a videoconferencing device

1    that is configured to receive control data such as call set-up information, receive and manage

2    transfer of real-time audio and video data streams, provide quality of service capabilities, provide

3    security capabilities, and enforce policies based on subscriber specific settings.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



FIG. 3

22    Figure 3 shows that the videoconferencing services switch is configured to: (a) receive control

23    data such as call set-up information (control plane module 302); and (b) receive and manage

24    transfer of real-time audio and video data streams (data plane module 304).  Exhibit 1, '526

25    patent, Figure 3; *see also* c. 6, ll. 46–56, c. 6, l. 65-c.7, l. 1.

26

27

28



FIG. 4B

Figure 4B, shown above, shows that the videoconferencing services switch is also configured to: (c) provide quality of service capabilities (quality of service module 420); (d) provide security capabilities (security module 431); and (e) enforce policies based on subscriber specific settings (policy engine 418).  Exhibit 1, '526 patent, Figure 4B; *see also* c. 8, l. 66–c. 9, l. 11, c. 9, ll. 42–57, c. 8, ll. 49–65.

TS's proposed construction for the term videoconferencing service switch is taken directly from the intrinsic evidence.  In addition, David Klausner, one of ordinary skill in the art, has opined that TS's proposed construction is consistent with how this term would have been understood by one of ordinary skill in the art.  Exhibit 3, Rebuttal Report Klausner, pp. 5-7.  As a result, TS's proposed construction should be adopted by the Court.

2.    **"enterprise gateway" and "enterprise video gateway"**

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| a videoconferencing device in the subscriber network configured to manage secure communications between terminals or endpoints and the videoconferencing services switch. | Videoconferencing device in the subscriber network with a globally routable IP address that receives and sends videoconferencing signaling and media |

TS's proposed construction is once again taken directly from the specification.  The specification describes the enterprise video gateway / enterprise gateway as a device that is configured to manage secure communication between terminals or endpoints and the videoconferencing services switch.  The specification of the '526 patent states:

> **Each enterprise subscriber network 18 also typically includes an enterprise video gateway** 36 and enterprise edge router 38. Enterprise edge router 38 is configured to route data traffic between terminals 34 and service provider network 14, based on source and destination IP addresses.

Exhibit 1, '526 patent, c. 5, ll. 24–28.

Enterprise video gateway 36 typically includes an emulation module 40 which emulates H.323/SIP call control and firewall functionality and an encryption module 44. The gateway also typically has a globally routable IP address and is **configured to manage secure communication between terminals 34 and the videoconferencing services switch 12.** Typically, emulation module 40 appears to terminals 34 as H.323 gatekeeper/SIP proxy and H.323/SIP application proxy firewall which includes network address translation (NAT) capability, which hides internal address from outside devices.

Exhibit 1, '526 patent c. 5, ll. 29–40; c. 5, ll. 15-16 ("Terminals 34 may also be described as 'endpoints' in a videoconferencing call."). *See also* c. 4, ll. 21–32, c. 5, ll. 41–55, c. 7, ll. 53–65.

Figure 1 also supports TS's proposed construction.



FIG. 1

As shown above, the enterprise video gateway 36 is a videoconferencing device in the subscriber network 18 configured to manage secure communications (e.g., encryption 44) between terminals or endpoints 34 and the videoconferencing services switch 12. In addition, one of ordinary skill in the art would have understood the terms "enterprise video gateway" and "enterprise gateway," as used in the '526 patent, to mean "a videoconferencing device in the

9

subscriber network configured to manage secure communications between terminals or endpoints

and the videoconferencing services switch."  Exhibit 3, Rebuttal Report Klausner, pp. 7-8.  As a

result, TS's proposed construction should be adopted.

**3.     "access point"**

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| Does not require construction.  Common and ordinary meaning. | first service provider site through which subscribers connect to the service provider network |

When a claim term or phrase will be readily comprehensible to the finder of fact, the term

or phrase requires no construction.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568

(Fed. Cir. 1997).  "Claim construction is a matter of resolution of disputed meanings and

technical scope, to clarify and when necessary to explain what the patentee covered by the claims,

for use in the determination of infringement.  It is not an obligatory exercise in redundancy."  *U.S.*

*Surgical*, 103 F.3d at 1568.  The term "access point" is readily comprehensible and does not

require construction.  Exhibit 3, Rebuttal Report Klausner, pp. 9-10.  As a result, the Court should

not construe the term.  Rather, the terms common and ordinary meaning should apply.

**4.     "service provider IP network" and "service provider network"**

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| a packet-switched Internet Protocol (IP) network through which multiple enterprise subscriber networks can access a global IP network, such as the Internet | Network of the company that supplies Internet access to the multiple enterprise subscribers |

TS's proposed construction for "service provider IP network" and "service provider

network" is taken directly from the intrinsic evidence.  The '526 patent specification states:

> Service provider network 14 typically includes **a packet-switched Internet Protocol**
> **(IP) network through which multiple enterprise subscriber networks 18 may**
> **access a global IP network 20, such as the Internet 20**. Typically, the service
> provider network 14 includes an access point 16, such as a POP 16. The POP has a

10

unique IP address and/or dial-up telephone number that a device on the enterprise subscriber network 18 may contact to access network 20.

Exhibit 1, '526 patent, c. 4, ll. 33–40.  *See also* c. 6, ll. 9–16.  Figures 1, 2, and 4B further illustrate that a service provider IP network / service provider network is a packet-switched Internet Protocol (IP) network through which multiple enterprise subscriber networks can access a global IP network, such as the Internet.  *See* Exhibit 1, '526 patent, Figures 1, 2, 4B.  As a result, TS's proposed construction should be adopted.

5.      **"subscriber" and "enterprise subscriber"**

| **TS's Proposed Construction** | **Accused Infringer's Proposed Construction** |
| --- | --- |
| an entity having a videoconferencing terminal | enterprise that has entered into a service level agreement with the service provider for videoconferencing services |

The specification describes a subscriber / enterprise subscriber as an entity having a videoconferencing terminal.  TS's proposed construction is supported directly by the specification of the '526 patent.  The specification states,

> **Each of enterprise subscriber networks 18 typically includes a plurality of terminals 34.** Terminals 34, along with video conferencing service switch 12 and the various other components of system 10, are typically H.323 or SIP compliant. Terminals 34 are typically videoconferencing devices configured to display and record both video and audio. Terminals 34 may be desktop computers, laptop computers, mainframes and/or workstation computers, or other videoconferencing devices. Terminals 34 may also be described as "endpoints" in a videoconferencing call. The terminal 34a originating the videoconferencing call is referred to as an origination endpoint 34a, and the other terminals requested to join in the call are referred to as destination terminals, shown at 34b, 134a, 134b. Terminal 34b is a local zone destination terminal, while terminals 134a, 134b are remote zone destination terminals. Local and remote zones are defined below.

Exhibit 1, '526 patent, c. 6, ll. 7–29; *see also* c. 6, ll. 1–39.  Figures 1 and 2 further support

Plaintiff's proposed construction.  As a result, Plaintiff's proposed construction should be adopted

by the Court.[2]

**6.      "configuring the switch to connect calls," "being configured to process videoconferencing data" and "being configured to process videoconferencing calls"**

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| Do not require construction.  Ordinary and customary meaning. | registering subscriber terminal network addresses at the videoconferencing services switch using registration messages from the subscriber terminals<br><br>and<br><br>having registered subscriber terminal network addresses at the videoconferencing services switch using registration messages from subscriber terminals |

When a claim term or phrase will be readily comprehensible to the finder of fact, the term

or phrase requires no construction.  *U.S. Surgical*, 103 F.3d at1568.  "Claim construction is a

matter of resolution of disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims, for use in the determination of infringement.  It

is not an obligatory exercise in redundancy."  *Id*.  The terms "configuring the switch to connect

calls" and "being configured to process videoconferencing [data/calls]" are readily

comprehensible, and therefore do not require construction.  *See also* Exhibit 3, Rebuttal Report

Klausner, pp. 10-11.  As a result, the Court should not construe the same.  Rather, the terms

common and ordinary meaning should apply.

---

[2] The accused infringers have also identified the terms "enterprise subscriber network," "multiple subscriber networks" and "multiple enterprise subscriber networks" as potentially requiring construction.  TS's position is that these additional terms do not require additional construction aside from the construction of the terms "subscriber" and "enterprise subscriber," which are embedded in these additional terms.

7.     **"a core router configured to route videoconferencing traffic across a computer network backbone to a destination terminal in a remote zone"**

| __TS's Proposed Construction__ | __Accused Infringer's Proposed Construction__ |
|---|---|
| a core router configured to route videoconferencing traffic across a global IP network, such as the Internet, to a destination terminal connected to a different access point | a core router that routes videoconferencing traffic across a computer network backbone from one subscriber terminal to another subscriber terminal connected to a different access point. |

TS's construction is directly supported by the specification of the '526 patent. The '526 patent specification states:

> **Service provider network 14 typically includes a packet-switched Internet Protocol (IP) network through which multiple enterprise subscriber networks 18 may access a global IP network 20, such as the Internet 20**. Typically, the service provider network 14 includes an access point 16, such as a POP 16. The POP has a unique IP address and/or dial-up telephone number that a device on the enterprise subscriber network 18 may contact to access network 20.

Exhibit 1, '526 patent, c. 4, ll. 33-40. The '526 specification further states:

> **System 10 is divided into local metropolitan zone 11 and remote metropolitan zone 111 separated by backbone 32**. Local metropolitan zone 11 includes all devices that connect to POP 16, and remote metropolitan zone 111 includes all devices that connect to POP 116. Components within remote metropolitan zone 11 are similar to those in local metropolitan zone 11 and are numbered correspondingly, and therefore will not be redescribed in detail.

> **System 10 may be configured to connect a two-party or multiparty videoconference call from an origination terminal 34a to a destination terminal 34b on local zone 11, and/or one or more destination terminals 134a and 134b on remote zone 111**. A destination terminal on local zone 11 may be referred to as a local destination terminal, and a destination terminal on remote zone 111 may be referred to as a remote destination terminal.

Exhibit 1, '526 patent, c. 6, ll. 1-16. *See also* c. 4, l. 33–c. 5, l. 6,

Figure 1, shown below, further illustrates that "a core router configured to route videoconferencing traffic across a computer network backbone to a destination terminal in a remote zone" means "a core router configured to route videoconferencing traffic across a global IP network, such as the Internet, to a destination terminal connected to a different access point."

13





**FIG. 1**

As shown in the above annotation of Figure 1, videoconferencing traffic is routed by core router 22 across a global IP network such as the Internet 20 to a destination terminal 134, 134a, or 134b connected to a different access point 116.  Figure 1 illustrates that the originating terminal, terminal 34, 34a or 34b, is connected to one access point 16.  The destination terminal, terminal 134, 134a or 134b is connected to a *different* access point 116.  The originating terminal communicates with the destination terminal by having its videoconferencing data routed across the Internet 20.  To accomplish this a core router 22 routes videoconferencing traffic across the Internet 20.

    The specification of the '526 patent supports TS's proposed construction of "a core router configured to route videoconferencing traffic across a computer network backbone to a destination terminal in a remote zone" as "a core router configured to route videoconferencing

traffic across a global IP network, such as the Internet, to a destination terminal connected to a

different access point."  As such, the same should be adopted by the Court.

**8.     "subscriber-specific settings" and "subscriber-specific security settings"**

| TS's Proposed Construction | Accused Infringer's Proposed Construction |
|---|---|
| settings for each subscriber related to security or management of videoconferencing calls from that subscriber.  Exemplary policies include outbound/inbound calling privileges, encryption policies, bandwidth policies, priority among users policies, participation privileges, inbound/outbound calling restrictions, time-of-day restrictions, audio or video restriction. | No construction necessary. |

TS's construction is directly supported by the specification of the '526 patent.  The '526

specification states:

> Referring initially to FIG. 1, a videoconferencing system according to one embodiment of the present invention is shown generally at 10. System 10 typically includes a videoconferencing services switch (VSS) 12 positioned on a service provider network 14 at an access point 16, typically a point of presence (POP). Switch 12 is configured to register multiple enterprise subscriber networks 18 for videoconferencing services, receive **subscriber-specific settings for each subscriber 18 related to security and management of the videoconferencing calls from that subscriber**, and process videoconferencing calls from each subscriber based on the associated subscriber-specific settings.

Exhibit 1, '526 patent, c. 4, ll. 21–32.

> Switch 12 also includes a policy engine 418 configured to enforce policies based on subscriber-specific settings on the videoconferencing calls. The policies may be based on subscriber-wide settings 408*f* that apply to all calls from a given subscriber, and user-specific settings that apply to only a single user or terminal of a given subscriber. **Exemplary policies include outbound/inbound calling privileges, encryption policies, bandwidth policies, priority among users policies, participation privileges, inbound/outbound calling restrictions, time-of-day restrictions, audio or video restrictions.** Each of these exemplary policies may be implemented on a per-user or per-subscriber basis. For example, a particular user may be able to use unlimited bandwidth, have a top priority among users, be allowed to both view and participate in calls, be able to both initiate outbound and receive inbound calls, from 8am-6pm Mon-Fri, and not be 65 restricted to only audio or only video calling.

15

Exhibit 1, '526 patent, c. 8, ll. 49-65; *see also* c. 10, ll. 41-51, Figures 4A, 4B, and 6-9.  In addition, the term "subscriber-specific settings" may not be readily comprehensible to the finder of fact.  It should therefore be construed by the Court.  *U.S. Surgical*, 103 F.3d at 1568.  Given that TS's proposed construction is taken directly from the specification, the same should be adopted.

**9.    "a firewall exists between the enterprise gateway and the videoconferencing data is passed the firewall unexamined"**

| **TS's Proposed Construction** | **Accused Infringer's Proposed Construction** |
|---|---|
| a firewall exists between the enterprise gateway and the access point to the service provider IP network and video conferencing data is passed through the firewall unexamined | Indefinite[3] |

TS's proposed construction is directly supported by the specification.  The '526 specification states:

> **Videoconferencing data may be carried from terminal 34 to service provider network 14 via one of two routes.** First, the videoconferencing data may be routed by edge router 38 via a direct network connection 42, such as a T1 connection, to the videoconferencing services switch 12 of the service provider network 14. In this case, the direct network connection is dedicated to video traffic. Second, **<u>firewall 40 may be configured to pass encrypted videoconferencing data through the firewall unexamined</u>**. Typically, **the encrypted videoconferencing data is encrypted by the encryption module 44 of the enterprise video gateway 36 using the IPSec protocols, discussed above.**

Exhibit 1, '526 patent, c. 5, ll. 56–67; *see also* Figure 1 (illustrating that the firewall 40 exists between the enterprise video gateway 36 and the access point 16 to the service provider IP network).  Despite this, the accused infringers contend that this limitation is indefinite.

---

[3] TS and Margalla will respond more fully to the accused infringer's arguments that this limitation and the limitation "virtual router" are indefinite in TS's and Margalla's Reply Brief after the accused infringers have fully articulated their respective arguments in their Responsive Claim Construction Brief(s).

Patents are presumed to be valid and overcoming this presumption requires clear and convincing evidence. *Centocor Ortho Biotech, Inc. v. Abbott Lab's*, 2011 WL 635291 *4 (Fed. Cir. Feb. 23, 2011) (citing *Ariad Pharm., Inc. v . Eli Lilly & Co*., 598 F.3d 1336, 1354 (Fed. Cir. 2010)).  If a claim limitation is subject to construction (i.e., it is not insolubly ambiguous) then it is not invalid for indefiniteness.  *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003) (emphasis added).

The limitation "a firewall exists between the enterprise gateway and the access point to the service provider IP network and video conferencing data is passed through the firewall unexamined" is unquestionably amenable to construction (i.e., it is not insolubly ambiguous).  As such, it cannot be indefinite.  Further, David Klausner, as one of ordinary skill in the art, has opined that he is able to discern the boundaries of claim 9, including this limitation, based on his review of the '526 patent.  Exhibit 2, Opening Report Klausner, pp. 6-7; Exhibit 3, Rebuttal Report Klausner, pp. 11-13.  He further opines that one of ordinary skill in the art would understand this limitation to mean a firewall exists between the enterprise gateway and the access point to the service provider IP network and video conferencing data is passed through the firewall unexamined."  Exhibit 2, Opening Report Klausner, pp. 6-7; Exhibit 3, Rebuttal Report Klausner, pp. 11-13.  As such, the Court should adopt TS's proposed construction and reject the accused infringer's indefiniteness arguments.

**10.    "virtual router"**

| __TS's Proposed Construction__ | __Defendant's Proposed Construction__ |
|---|---|
| Does not require construction.  Common and ordinary meaning. | Indefinite |

The common and ordinary meaning of the term "virtual router" should control.  The term virtual router is well understood in the art and is readily understood by those of ordinary skill in the art having reviewed the '526 patent.  For example, the term "virtual router" is defined on page

17

2 of the memorandum published by the Internet Engineering Task Force ("IETF")[4] that is

attached to Mr. Klausner's Opening Report.  Exhibit 2, Opening Report Klausner, Exhibit C, p. 2.

The IETF paper defines the term "virtual router" to mean:

> Virtual Router (VR) - A Virtual Router emulated instance of a physical router, and
> services that are available with a physical router are made available with a Virtual
> Router.  Each VR has a separate routing and forwarding table.

*Id.*  In addition, several patents that pre-date the '526 patent use the term "virtual router" in a

manner that is consistent with the terms use in the '526 patent.  *See e.g.,* Exhibit 4, U.S. Patent

No. 6,205,488; Exhibit 5, U.S. Patent No. 6,594,704; Exhibit 6, U.S. Patent No. 6,597,699;

Exhibit 7, U.S. Patent No. 6,674,756.

   Defendants' contentions that the term is indefinite are unsupported.  David Klausner has

opined that one of ordinary skill in the art is able to discern the boundaries of claim 26, including

the term "virtual router."  Exhibit 2, Opening Report Klausner, p. 6; Exhibit 3, Rebuttal Report

Klausner, pp. 13-14.  Mr. Klausner has further opined that "the term 'virtual router' delineates the

scope of the invention using language that adequately notifies the public of the patentee's right to

exclude.  *Id.*  The term "virtual router" means just that—a virtual instance of a router (i.e., a

"virtual router").  As such, this term does not require construction and the accused infringer's

arguments that this term is indefinite should be rejected.

## IV.    CONCLUSION

   TS's proposed constructions are directly from the '526 patent specification, which is the

single best guide in construing patent terms.  TS's proposed construction should therefore be

adopted.  The Court should also decline to construe terms that are readily comprehensible and do

not require construction.  Rather the common and ordinary meaning of those terms should

control.   In addition, the limitations "a firewall exists between the enterprise gateway and the

---

[4] The IETF is an agency that is tasked with formulating standards, such as those for routers,
including virtual routers, and the Internet.  Exhibit 2, Opening Report Klausner, p. 6.

videoconferencing data is passed the firewall unexamined" and "virtual router" are not insolubly ambiguous and do not render claims 9 and 26 indefinite.  As a result, the accused infringers' indefiniteness arguments should be rejected by the Court.

Dated: April 29, 2011                    THE SIMON LAW FIRM, P.C.

                                         By:    /s/ Timothy E. Grochocinski
                                         Anthony G. Simon
                                         Timothy E. Grochocinski
                                         800 Market Street, Suite 1700
                                         Saint Louis, Missouri 63101
                                         P. 314.241.2929
                                         F. 314.241.2029
                                         asimon@simonlawpc.com
                                         teg@simonlawpc.com

                                         Kenneth R. Wright, Esq.
                                         Robert W. Hicks & Associates
                                         14510 Big Basin Way, Suite 151
                                         Saratoga, California 95070
                                         P. 619.846.4333
                                         F. 408.624.9369
                                         kwright@wrhlaw.com

                                         **ATTORNEYS FOR TELECONFERENCE
                                         SYSTEMS, LLC AND MARGALLA
                                         COMMUNICATIONS, INC.**


## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing was served on counsel for all

parties of record on April 29, 2011 via the Court's CM/ECF system.


                                         /s/ Timothy E. Grochocinski
                                         Timothy E. Grochocinski