**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CISCO SYSTEMS, INC.,

    Plaintiff,

  v.

TELECONFERENCE SYSTEMS, LLC, et al.,

    Defendants.

No. C 09-01550 JSW

**CLAIMS CONSTRUCTION ORDER**

---

TELECONFERENCE SYSTEMS, LLC,

    Plaintiff,

  v.

TANDBERG, INC., et al.,

    Defendants.

No. C 10-01325 JSW

---

TELECONFERENCE SYSTEMS, LLC,

    Plaintiff,

  v.

AT&T CORP., et al.,

    Defendants.

No. C 10-05740 JSW

_____/

The Court has been presented with a technology tutorial and briefing on the construction of claim terms *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the ten claim terms selected by the parties which appear in the patent at issue in this case, United States Patent No. 6,980,526 ("the '526 Patent") called the "Multiple Subscriber Videoconferencing System."

**BACKGROUND**

Teleconference Systems, LLC and Margalla Communications, Inc.'s ("Plaintiffs") contends that Cisco System, Inc., HSBC USA, Inc., Baxter Healthcare Corporation, Applied Materials, Inc., Wachovia Corporation, Staples, Inc., Enbridge Holdings (U.S.), L.L.C., General Electric Company, SAP America, Tandberg, Inc., Avago Technologies U.S. Inc, Bayer Corporation, One Communications Corp., AT&T Corporation, and Frito-Lay North America, Inc. (collectively referred to as "Defendants") infringe the '526 Patent.

The Court shall address additional facts as necessary in the remainder of this Order.

**ANALYSIS**

**A.   Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods.*, *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg.*, *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). A court's final construction, therefore, must accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the

3

1  language of the claims, read without reference to the specification, might be considered broad
2  enough to encompass the feature in question").

3  Intent to limit the claims can be demonstrated in a number of ways. For example, if the
4  patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of
5  the disputed claim term in either the specification or prosecution history," a court will defer to
6  that definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In
7  order to so limit the claims, "the patent applicant [must] set out the different meaning in the
8  specification in a manner sufficient to give one of ordinary skill in the art notice of the change
9  from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt
10 an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished
11 that term from prior art on the basis of a particular embodiment, expressly disclaimed subject
12 matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288
13 F.3d at 1367. For example the presumption of ordinary meaning will give way where the
14 "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of
15 manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV*
16 *Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). Likewise, the specification may
17 be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in
18 the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the
19 words alone." *Teleflex*, 299 F.3d at 1325.

20 However, limitations from the specification (such as from the preferred embodiment)
21 may not be read into the claims, absent the inventor's express intention to the contrary. *Id.* at
22 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the
23 specification every conceivable and possible future embodiment of his invention.'") (quoting
24 *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this
25 result, a court's focus should remain on understanding how a person of ordinary skill in the art
26 would understand the claim terms. *Phillips*, 415 F.3d at 1323.

27 If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim
28 language, a court then may turn to extrinsic evidence, such as expert declarations and testimony

4

from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words...." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id*. at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B.     Claim Construction.**

   **1.     "Videoconferencing Services Switch"**

Claim 1 of the '526 Patent recites a "method for videoconferencing using Internet Protocol (IP), the method comprising the steps of: installing a videoconferencing services switch at an access point to a service provider IP network; ...." (13:33-41.) The word "videoconferencing services switch" also appears in Claims 5, 6, 7, 8, 18, 21, 22, 24, and 26.

5

Plaintiffs argue that the term "videoconferencing services switch" must be construed to mean "a videoconferencing device that is configured to receive control data such as call set-up information, receive and manage transfer of real-time audio and video data streams, provide quality of service capabilities, provide security capabilities, and enforce policies based on subscriber specific settings." (Third Amended Final Joint Claim Construction and Pre-hearing Statement ("Statement"), Ex. A.) Defendants, on the other hand, argue that the term should be construed to mean "videoconferencing device that processes videoconferencing call requests and establishes connections between subscribers' terminals for those calls." (*Id*.)

Both parties agree that the videoconferencing services switch processes call requests and establishes connections for those calls. The '526 Patent supports this construction. (*See* '526 Patent at 3:28-33.) Plaintiffs contend that the '526 Patent teaches that the videoconferencing services switch does more, as described above. Defendants counter that Plaintiffs' proposed additional tasks are merely optional according to the '526 Patent. The Court finds that the '526 Patent teaches that the videoconferencing services switch includes a call control module (which is configured to perform set up operations, manage data streams, and perform tear down operations), a policy engine (which is configured to enforce policies based on subscriber-specific settings), and a quality of service module. (*See* '526 Patent at 8:46-51, 8:66-9:41, 11:4-8, Fig. 4A and 4B.) However, the Court finds that the remainder of the Plaintiffs' suggested tasks are merely optional. Therefore, the Court construes the term "videoconferencing services switch" to mean: "a videoconferencing device that processes videoconferencing call requests and establishes connections between subscribers' terminals for those calls. The device includes a call control module (which is configured to perform set up operations, manage data streams, and perform tear down operations), a policy engine (which is configured to enforce policies based on subscriber-specific settings), and a quality of service module."

### 2. "Enterprise Gateway" and "Enterprise Video Gateway"

The parties agree that the terms "enterprise gateway" and "enterprise video gateway" have the same meaning. Accordingly, the Court will construe these terms in the same manner. These terms appear in Claims 6, 9, 18, 19, and 26 of the '526 Patent. Plaintiffs argue that these

6

1  terms mean "a videoconferencing device in the subscriber network configured to manage secure
2  communications between terminals or endpoints and the videoconferencing services switch."
3  (Statement, Ex. A.) Defendants, in turn, argue that these terms should be construed to mean
4  "videoconferencing device in the subscriber network with a globally routable IP address that
5  receives and sends videoconferencing signaling and media." The Court finds that Defendants'
6  proposed construction is supported by the intrinsic evidence and thus, adopts this construction.

### 3. "Access Point"

The term "access point" appears in Claims 1, 5, 18, 23, and 26. Plaintiffs argue that the term "access point" has a common and ordinary meaning and, thus, does not require any construction. Defendants, on the other hand, argue that this term should be construed to mean: "first service provider site through which subscribers connect to the service provider network." Upon review of the intrinsic evidence, the Court rejects Defendants' proposed construction. "First service provider site" is a new term that is not described, or even mentioned, in the '526 Patent.

Plaintiffs argue that the term access point simply means "the place through which subscribers gain access to the service provider network." Based upon review of the Claims and the specification of the '526 Patent, the Court agrees. However, the Court also agrees that this meaning is clear upon a reading of the Claims and that, therefore, it does not require construction. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2011) (where court resolves dispute regarding scope of the term by rejecting one party's proposed construction, the court is not obligated to construe the term in order to provide additional guidance to the jury).

### 4. "Service Provider IP Network" and "Service Provider Network"

The parties agree that the terms "service provider IP network" and "service provider network" have the same meaning. Accordingly, the Court will construe these terms in the same manner. These terms appear in Claims 1, 5, 18, and 23 through 26 of the '526 Patent. Plaintiffs argue that the terms should be construed as "a packet-switched Internet Protocol (IP) network through which multiple enterprise subscriber networks can access a global IP network, such as

7

1   the Internet." Defendants, on the other hand, argue that these terms should be construed as
2   "network of the company that supplies Internet access to the multiple enterprise subscribers."
3   The parties dispute whether the "service provider" should be defined as a "company" and
4   whether the network must be the network of the service provider or any network. The Court
5   finds that, based on a reading of the Claims and the specification, the '526 Patent teaches that
6   the network is a packet-switched Internet Protocol ("IP") network and this network must be the
7   service provider's network. The Court does not find any support for further defining the
8   "service provider" to be a company. Accordingly, the Court construes the terms "service
9   provider IP network" and "service provider network" to mean; "a packet-switched Internet
10  Protocol (IP) network provided by the service provider."

    **5.    "Subscriber"** and **"Enterprise Subscriber"**

12  The parties agree that the terms "subscriber" and "enterprise subscriber" have the same
13  meaning. Accordingly, the Court will construe these terms in the same manner. These terms
14  appear in Claims 1 and 5 of the '526 Patent. Plaintiffs argue that these terms should be
15  construed to mean "an entity having a videoconferencing terminal." Defendants counter that
16  these terms should be construed to mean "enterprise that has entered into a service level
17  agreement with the service provider for videoconferencing services." The specification
18  provides that "*many* of the subscriber-specific settings are governed by a Service Level
19  Agreement (SLA)." (*See* '526 Patent at 10:10-11.) It does not teach that *all* of the subscriber-
20  specific settings are governed by an SLA. Moreover, the Court does not find support in the
21  Claims for reading into them such a limitation. Accordingly, the Court rejects Defendant's
22  proposed construction. Based upon review of the Claims and the specification of the '526
23  Patent, the Court finds that the terms "subscriber" and "enterprise subscriber" should be
24  construed to mean: "an entity having one or more videoconferencing terminals that subscribes
25  for videoconferencing services."

26  The parties also seek to construe the terms "enterprise subscriber network," "multiple
27  subscriber networks," and "multiple enterprise subscriber networks." These terms appear in
28  Claims 18, 22, 24, and 26 of the '526 Patent. Defendants argue that "enterprise subscriber

8

1 network" should be construed to mean "network of a subscriber" and that "multiple subscriber 2 networks," and "multiple enterprise subscriber networks" should be construed to mean 3 "networks of more than one subscriber." Except for the parties' dispute regarding the 4 construction of the terms "subscriber" and "enterprise subscriber," Plaintiffs do not oppose 5 Defendants' proposed construction of these terms. The Court's standing orders limits the 6 parties' request for construction to ten terms, absent a showing of good cause. Although these 7 additional terms would appear to exceed the limit without a showing of good cause, the parties 8 do not appear to have an actual dispute regarding these terms. Therefore, the Court construes 9 the term "enterprise subscriber network" to mean "network of a subscriber" and the terms 10 "multiple subscriber networks," and "multiple enterprise subscriber networks" to mean 11 "networks of more than one subscriber."

**6.  "configuring the switch to connect calls," "being configured to process videoconferencing data,"** and **"being configured to process videoconferencing calls"**

Plaintiffs contend that none of these terms need construction. Defendants, on the other hand, argue that "configuring the switch to connect calls" should be construed to mean "registering subscriber terminal network addresses at the videoconferencing services switch using registration messages from the subscriber terminals" and that "being configured to process videoconferencing data" and "being configured to process videoconferencing calls" should be construed to mean "having registered subscriber terminal network addresses at the videoconferencing services switch using registration messages from subscriber terminals." Although Defendants seek to characterize this as one term, Defendants are seeking construction of multiple terms. The parties' request to have the Court resolve their construction disputes regarding more than ten terms without a showing of good cause violates the Court's standing orders. Therefore the Court will not construe the terms "configuring the switch to connect calls," "being configured to process videoconferencing data" and "being configured to process videoconferencing calls" at this time. This Order is without prejudice to the parties narrowing their request and submitting additional briefing regarding the one term for which they seek the

9

1 Court's construction. Alternatively, upon a showing of good cause, the parties may request that
2 the Court construe all of these terms.

3 **7.** **"a core router configured to route videoconferencing traffic across a**
4 **computer network backbone to a destination terminal in a remote zone"**

5 The term "a core router configured to route videoconferencing traffic across a computer
6 network backbone to a destination terminal in a remote zone services switch" appears in Claim
7 26 of the '526 Patent. Plaintiffs argue that the term "a core router configured to route
8 videoconferencing traffic across a computer network backbone to a destination terminal in a
9 remote zone" should be construed to mean "a core router configured to route videoconferencing
10 traffic across a global IP network, such as the Internet, to a destination terminal connected to a
11 different access point." Defendants, on the other hand, argue that this term should be construed
12 to mean: "a core router that routes videoconferencing traffic across a computer network
13 backbone from one subscriber terminal to another subscriber terminal connected to a different
14 access point."

15 According to Plaintiffs' proposed construction, the "backbone" should not be limited to
16 the internet and that the term "remote" would not have any apparent meaning. However, while
17 the intrinsic evidence does not address these terms in much depth, the '526 Patent teaches that
18 the "backbone" is an internet backbone. Moreover, the patentee "acted as his own
19 lexicographer," and defined the term "remote zone" in the specification. *CCS Fitness*, *Inc*., 288
20 F.3d at 1366. The local and remote zones are separated by an internet backbone. (*See* '526
21 Patent at 5:20-23, 6:1-8, Fig. 1.) Accordingly, the Court finds that the term "a core router
22 configured to route videoconferencing traffic across a computer network backbone to a
23 destination terminal in a remote zone" should be construed to mean: "a core router configured
24 to route videoconferencing traffic across an internet backbone to a destination terminal
25 connected to a different access point."

26 **8.** **"subscriber-specific settings "** and **"subscriber-specific security settings"**
27 The parties agree that the terms "subscriber-specific settings " and "subscriber-specific
28 security settings" have the same meaning. Accordingly, the Court will construe these terms in

10

1 the same manner. These terms appear in Claims 1, 2, 3, 4, 17, 18 and 26 of the '526 Patent.
2 Plaintiffs argue that the term "subscriber-specific settings" should be construed to mean:
3 "settings for each subscriber related to security or management of videoconferencing calls from
4 that subscriber. Exemplary policies include outbound/inbound calling privileges, encryption
5 policies, bandwidth policies, priority among users policies, participation privileges,
6 inbound/outbound calling restrictions, time-of-day restrictions, audio or video restriction."
7 Defendants, on the other hand, argue that this term has a common and ordinary meaning and,
8 thus, does not require any construction.

9 In their brief, Defendants make clear that they do not dispute that the '526 Patent
10 teaches that the terms "subscriber-specific settings" and "subscriber-specific security settings"
11 means "settings for each subscriber related to security or management of videoconferencing
12 calls from that subscriber." Although Defendants do not contend that this portion of Plaintiffs'
13 proposed construction is incorrect, Defendants argue that Plaintiffs' proposed construction does
14 not provide any clarification. The Court disagrees.

15 Defendants also contest Plaintiffs' construction to the extent it includes an unexhausted
16 list of examples of such subscriber-specific settings as unnecessary and confusing to the jury.
17 The Court agrees that providing such an unexhausted list of examples would not assist the jury
18 and could cause some confusion. The Court therefore rejects Plaintiffs' proposed construction
19 to the extent they include examples of such settings. Accordingly, the Court construes the terms
20 "subscriber-specific settings" and "subscriber-specific security settings" to mean: "settings for
21 each subscriber related to security or management of videoconferencing calls from that
22 subscriber."

23 **9. "a firewall exists between the enterprise gateway and the video conferencing**
24 **data is passed the firewall unexamined"**

25 The term "a firewall exists between the enterprise gateway and the video conferencing
26 data is passed the firewall unexamined" appears in Claim 9 of the '526 Patent. Plaintiffs argue
27 that the term "a firewall exists between the enterprise gateway and the video conferencing data
28 is passed the firewall unexamined" should be construed to mean: "a firewall exists between the

11

enterprise gateway and the access point to the service provider IP network and video conferencing data is passed through the firewall unexamined." Defendants, on the other hand, argue that this term is too indefinite.

It is undisputed that there was a drafting error with this term and that it is an incomplete phrase. The parties disagree whether, through the process of claim construction, the Court may supply missing words in order to define the term. The Federal Circuit has "repeatedly and consistently" made clear that "courts may not redraft claims, whether to make them operable or to sustain their validity." *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (citation omitted). "A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).

The term as it appears in Claim 9 states that the firewall exists between the enterprise gateway, but fails to state what is on the other side of the firewall. Plaintiff proposes that the Court construe "access point" to be the missing bookend on the other side of the firewall. However, whether the missing bookend is the access point is subject to reasonable debate based on consideration of the claim language and the specification. The term also fails to specify whether the videoconferencing data passes "around," "through," or "across" the firewall. As in *Rembrandt Data Technologies*, the Court finds that these errors in the '526 Patent are "not minor, obvious, free from reasonable debate or evident from the prosecution history." *Id.*, 641 F.3d at 1339. Accordingly, the Court cannot redraft Claim 9 and, thus, finds Claim 9 to be indefinite.

**10. "virtual router"**

Plaintiffs argue that the term "virtual router" means "software and/or hardware that emulates instances of a physical router (*i.e.*, services that are available with a physical router are made available with a virtual router)," but that this is the common and ordinary meaning of virtual router and, thus, this term does not require construction. Defendants, on the other hand,

argue that the term "virtual router" is too indefinite. This term appears in Claim 26 of the '526 Patent.

Upon review of the of the Claim language, the specification, and the extrinsic evidence cited to by the parties, the Court finds that "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002) (internal citation omitted). Therefore, the Court does not find that the term "virtual router" is indefinite.

However, the Court does not agree with Plaintiffs that the term "virtual router" does not require construction. "When the parties raise an actual dispute regarding the proper scope of [a] claim[], the court, not the jury, must resolve the dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-62 (Fed. Cir. 2008) (holding that a determination that no construction is needed may be inadequate if the parties' dispute remains unresolved). Here, if the Court does not construe the meaning of the term "virtual router," the dispute between the parties regarding what this term means will remain unresolved. Upon review of the intrinsic evidence, the Court finds that the '526 Patent teaches that the virtual router is software which emulates the functions of a physical router. For example, Figure 4A, which is a "software architecture of the videoconferencing system of FIG. 1," includes a virtual router. (*See* '526 Patent at 3:64-65, Fig. 4A.) The '526 Patent further teaches that the virtual router is typically stored in memory. (*See id*. at 6:60-63; *see also id*. at 11:32-34.) The Court did not find any description of the virtual router as hardware. The specification also describes the functions of a virtual router. These functions emulate those of a physical router. (*See id*. at 8:30-43.) This description is consistent with the language of Claim 26. Accordingly, the Court construes the term "virtual router" to mean "software which emulates the functions of a physical router."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms and phrases. By no later than December 16, the parties shall meet and confer

and file a stipulation selecting the one term, if any, for which they seek the Court's construction. ///

///

Alternatively, if the parties cannot narrow their request for construction to just one term, they may request the construction of additional terms upon a showing of good cause.

**IT IS SO ORDERED.**

Dated: November 28, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE